Before you begin, Mr. Rodofsky, let me just say this. If it were not for people such as Judge Hayden, District Court judges who help us out, given the crushing workload that we have, we could not function as well as we do, we like to think. But I thank Judge Hayden. She is certainly one of the stars in the District Court, and we're very privileged to sit with her. I agree. I concur. Mr. Rodofsky. Judge Backer, good afternoon. May I reserve two minutes for rebuttals? Granted. In 2004, this Court, in an opinion of Micken-Thomas II, found three independent constitutional violations where the whole Board denied Mr. Thomas parole after he'd been commuted by Governor Casey in 1996. This Court found an ex post facto violation under a statute that was passed in 2000 that required mandatory sex offender treatment. In this program, it found a related ex post facto violation with respect to the application of new parole rules that were passed in 1996, and it also determined under the due process clause that the parole board had been vindictive and retaliatory for a period of 10 years in denying Mr. Thomas parole. Let me ask you a question, Mr. Rodofsky. Is there a case in which there has been a ruling on parole by a court saying there were constitutional violations, and in that same case, that same rule has been applied in later applications for parole as we have here? That's what we do have here. Has that ever happened any other time? This case is unique. This case is absolutely unique. What you have today, I submit to you, Judge Brewer, is the mirrored image of what happened in 2004. What happened in 2004 is that this Court found that the parole board clearly violated ex post facto principles in denying parole. There was a single reason he was denied parole. But can that ruling be said to apply only to the first parole application background? I can't say how it can. Ex post facto means that the board today, six years later, did not apply a law that was passed in 2000 when Mr. Thomas was convicted in 1963. That's assuming that the language that they're using and the subsequent denials can be deemed to be the same thing, even though perhaps a word or two is different. We are faced, and in my singular image, I use that advisory, I think we have exactly the same situation today in 2010 as we had in 2004. The reason that has been given, there have been five denials of parole since Mr. Thomas was incarcerated in 2006. And let me remind the Court, when Mr. Thomas was arrested and recommitted in 2005, not 2006, in 2005, it was for a technical violation of parole. He had failed to complete a therapy program. Okay, they could violate him for that. They found he was a non-aggravated violation. He received a nine-month setback. And during the course of those proceedings, when that was challenged, his parole officer said, this is the kind of conduct that usually results in a one- to two-month jail sentence. We are now approaching six years. We have had five denials of parole. Was he denied again in April 2010? He was denied in June of 2010. It's not part of the record. I just discussed it with Mr. Moore. He was denied again. They revoked that denial. But the point is, he has continued to be refused parole. The language in every parole denial is in the appendix, pages 8 through 16 of the appendix. The language in each of the parole denials, the central reason, the primary reason, as it was in 2004, was that Mr. Nickens Thomas has refused to engage in the sex therapy program that involves admitting to the crime. He completed all the denial programs. He was in prison initially. He's engaged in every other program that the institution has required. He's received institutional approval for parole. He's had no mental health problems. There's not another single factor that the state can point to to deny parole except this central factor, that he refuses to engage in therapy. Yes, Judge Adams. Thank you, Doctor. Can I ask something about the record on this? I read somewhere, I believe, that Gregor, am I pronouncing his name properly? Gregor. Gregor. All of these developers and a later program. And there was something else in the record that indicated that he could be moved to another sex therapy program. Could you just clarify that a little bit? Yes, I think what the record fairly reflects is that what the parole group requires of him today is to be in sex therapy and an admittance program. They will not accept a denial program. There is no admittance program at Gregor for me. There is an admittance program. There is not. That's not the problem. It's not that there's not an admittance program there. Our position is that he has a right, under the ex post facto law and due process, not to have to engage in that admittance program as a condition of parole because that is a new requirement. That's a requirement that was first imposed in the year 2000. And whether we agree or not with other circuits that say sex therapy is not subject to ex post facto consideration, in Mr. Mickens-Thomas' case, we already have a ruling by this court that it is. You have the clearest ruling from this court. If you look at the 2004 ruling by Judge Rose, it couldn't be clearer. Unanimous panel opinion finding a clear ex post facto denial, not only in the basis of the 2000 statute at 9718, which explicitly requires as a condition for parole that you engage in sex therapy and an admittance program, but also finding, and this is important as well, that the board also at that point had applied the post 1996 new parole act, which puts total emphasis on public safety, and disregarded every positive indication for parole. So the court of appeals that this court in 2004 found, both cases, as I emphasized, also found the victimness and retaliation because Mr. Thomas had challenged them for a period of 10 years. Can I just pull apart a little bit the ex post facto and prove me if I'm being a little bit wrong in this question. When it was found to be an ex post facto violation, a lot of it depends upon the dates, correct? The sentence was commuted in January 14, 1995, I believe. That's correct.  The minimum sentence at that time became 41 years, 906 days, making Mr. Thomas eligible for parole on July 21, 1996. Correct. In the meantime, the purposes of one of the ex post facto findings, those parole amendments and the emphasis became instead of whatever the maximum factors were in the balancing test. And then, of course, 2000 is after all of those important dates as well. Even in researching this, I bumped up against a Commonwealth of Pennsylvania case that said,  that parolees enjoy a liberty interest in their freedom that somebody who had never achieved parole or been granted parole does not enjoy. That's just kind of a little glitter. But it forced me to kind of rethink this whole issue of a sentence that Mr. Mickens-Thomas is serving to win. In fact, the grant of parole is, as the case law in this case is involved in one of the series of decisions, is it's not an absolute right. It's a grant of the mercy of the state and so on. And that was used to blight some of the constitutional arguments. But if in fact that's the case, then Mr. Mickens-Thomas' sentence is a sentence that he was given at the time that he was sentenced, or the sentence that he was serving at the time that the sentence was committed, then many of that were thoroughly grounded in the pre-1996 amendment law. Am I correct about that? Is that true? I think that's correct. He is serving a very standard question, a new structure question. He is serving a life sentence that was imposed in 1964 after his second trial. And that's why we have an ex post facto problem because we have significant changes in the law in 1996, as you pointed out, and again in 2000, and independent from that we've got some new process issues. But on ex post facto, we have those post-sentence changes. And Mickens-Thomas followed consistent law in the U.S. Supreme Court by saying that those post-sentence changes in the law disadvantage the inmate. And clearly he's disadvantaged here. This is the only reason he's been denied parole. If it disadvantages him, that rule cannot be applied. As I say, when you look at each of the parole denials for the past five years, that's the central and primary reason. Indeed, the state, in its brief, spends literally only an inch and a half on this issue because it really has nothing to say. What the state says is, well, it's not clear the statute was applied. It wasn't clear Mickens-Thomas No. 2 in 2004. And in the new case, the court said it doesn't matter that the statute wasn't referenced. It's clear what they're referring to here. The fact that they had discretion beforehand, that is, they could have said sex therapy before, ex post facto law makes very clear the fact that there was discretion before. When you move to a mandatory system, you are disadvantaged here. That's Lindsay v. Washington and a whole run of cases. And on the issue of whether he is disadvantaged in this case, the evidence, I think, is stronger than it was in 2004. What you have is a six-year pattern of denial of parole. The parole officer says, compared to everybody else in this situation, they got one to two months. We're now running up to six years. He's 82 years old. He's got no mental health problems. He's got no problems in the prison. They consistently recommend him for parole. He can't be that he's not disadvantaged. He's been recommended for parole each time that he's applied? Each time by all the requirements that he needs. The Department of Corrections has recommended for parole. They have said he's completely below the programs. There's not been a single misconduct on his record in that six-year period. The only thing that's left is the sex-therapy program. You're going to hear from Mr. Miller about this, quote, an escalating pattern of high-risk behavior. Yes. And, quote, why don't you address that? Let me address that. And that's what was taken. Say, well, there are other things going on here. Number one, he was not violated for high-risk behavior. He was violated for not completing the sex-therapy program and he had a disagreement with the therapist. Sure, was he inappropriate? Was he a little sarcastic about what happened? We admit that he was. The high-risk behavior he talked about includes such things as fixing umbrellas and getting them to work. I didn't understand what that was about. There's a reference somewhere about he also made threatening statements to two members of his therapy group. I see no substantiation for that. What was his thing with the umbrellas and driving all ladies home from the supermarket? It shows absolutely nothing. In fact, he did do that, yes. He professed umbrellas and they went to work. He would drive women home from the supermarket. He was not told as a condition of parole he couldn't have contact with women. Is that threatening behavior? Is that the escalating high-risk behavior? That's what they describe as escalating high-risk behavior. But to be fair, what they really focus on is this kissing incident. He's in his church. He inappropriately kisses a woman in the church. The woman says, what are you doing? He apologizes, and as far as she's concerned, it's over. He self-reports that. He self-reports that in therapy, and they say that's an indication of your sexual problems. He said it wasn't a sexual problem. I did something I shouldn't have done, I'm sorry. She apologized. They interviewed her. We did get a statement from her that said it was nothing. And that was a disagreement between him and the therapist. She thought it was sexually grounded. He said it wasn't. He became sarcastic, and that's why he was sent out of the program. Now, in the charge, they said he acted in an intimidating fashion. There was a hearing. She testified. She said she was never intimidating. That's in the record. We include the transcript of the parole replication hearing in the transcript. She said she was never intimidating. He acted inappropriately. He acted sarcastically. We dismissed him from the program. So his high-risk behavior, A, doesn't exist, number one. And, number two, even if it did, at the time they revoked his parole, under the Pennsylvania parole laws, they could have called this an aggravated incident. That would have led to an 18-month setback. It didn't. They saw this as a minor technical violation of parole. They gave him the nine-month setback. We can live with that. He does have nine months. And his parole officer, very important, they say there's no record here that other people in this situation are treated differently. But his parole officer rebutts that. His parole officer said, based on what I've seen, you do one to two months for this kind of incident. And here we are, 35 times in time since that one to two months. And that's the situation. In the 266 prisoners who were there, sentences commuted by Governor Casey, 265 of them around four. And that's the retaliation point. Mr. Thomas was the only one who was not granted parole after commutation back in 1996. He had a fight in the Commonwealth Court, in the Pennsylvania Supreme Court, in the federal courts. And that's why this court, with a well-grounded record, found vindictiveness and retaliation in 2004. We have the same thing going on now. You look at this record. How can you say this 82-year-old man who poses a risk to nobody is not eligible for parole when everybody else gets added for two months for this kind of violation? And the state continues to cite, remarkably, I don't know how they do it, but they continue to cite the fact he was used, sex offender, under treatment. But that's clearly an ex post facto violation. Mr. Dustman, please look at the volume two of the attendance list, A4, that gathers for that both by a client and two employees of the parole board. It is a request that appears from March 24, 2007. Yes. Yes. And Mr. Lincoln Thomas says, I've been advised to request to meet your involvement with your sex therapy group. And it indicates that he had been trying to get a hold of somebody for two weeks but wasn't able to. And then there's a two-line comment by Senator Gaddy that's following the request to somebody else. And then in the very right-hand, I guess the person who referred to it, Miranda says, Mr. Thomas, I poised you on the list for TX therapy. Therapy. My daughter's a doctor. That's what it is. Thank you. Unfortunately, there is a waiting list at this time. Also, please be advised that we will be on a remote line with you after one to three months if you do not admit to your offense. This will then affect your parole decision as you will be considered noncompliant. Now, is that the root of the endless loop that we've been traveling in terms of the parole denials? That's right. This 2007 request by Mr. Thomas followed the 2007 denial of parole. We're not only did they deny parole, they said if you want to get paroled, enroll in a sex therapy treatment program. Well, that's what he tried to do. And the institution, honestly enough, said, we'll get you in there. But we have to advise you, if you don't admit per the 2000 statute, you will not get paroled. This is further proof from a DOC employee who knows the rules here and knows the parole regulations and knows the parole statute. If you don't admit in this program, you will never be paroled. 2007, 2008, 2009, 2010. And I respectfully submit, unless this court intervenes, he will never. The inescapable fact of this record is Mr. Thomas will never be paroled. Well, let me ask you this question. You say unless this court intervenes, and certainly in Wiggins too, there was no shyness in that score. But the district court, in a very brief opinion, simply decided he had not exhausted his remedies. Should we remand to the district court in the first instance to determine the merit of the wrongdoing? I think at this point, we've exhausted. And to send them back would be a kind of exhaustion that would, I think, delay this to the point where, I don't want to get apt. I think the district court was wrong on exhaustion with that point. Clearly, what the Supreme Court did was decide this issue on the merits. If this is a continuing violation of the same term of imprisonment, do you need to exhaust? We would. I think this is actually continuing jurisdiction here under that part of the ruling. But even if it wasn't, either way, this was an exhaustion or continuing jurisdiction. And I would urge this court, you're in the same position as the court was in 2004. In 2004, they had told the parole board, we're going to disparal you. Consider it again. Don't consider these matters. The parole board, in your face, came back and said, we're going to make the same ruling. We won't deny it. It has to be sex-related treatment. They confirmed this six more times. We don't need a hearing in the district court. We don't need an argument. It's a pure matter of law at this point. And we would ask this court to take issue with this ruling. All right. Thank you. I'm sorry to hurt you. No, it's perfectly all right. We'll get you back on your battle. Mr. Moore. Thank you, Judge Berry. May it please the court, my name is John Moore. I'm with the Pennsylvania Attorney General's Office, and I represent our Board of Probation and Parole, which is compelling this matter. Well, you're a brave man to be here today, after hearing the arguments we've heard. You've read what we've read. Mr. Radoski was extremely capable in that argument. Yes, he was. But also quite wrong. All right. Well, let's start with one question. Why precisely is Mr. Rickens, Thomas, being denied parole this many years later? Precisely. Precisely because Mr. Thomas is back in prison right now because of his prior parole failure. You mean the church lady incident? I mean investigating a matter of high-risk behavior, which Mr. Radoski attempted to challenge unsuccessfully before Judge Buckwalter, and attempted to challenge unsuccessfully before Commonwealth Court in parole litigation. But before Judge Buckwalter, the first time when Mr. Rickens, Thomas, said, you can't say I violated my parole. I think this quote very properly said, well, we just said you have to get out. We didn't say you couldn't go back in. Now he's back in, and the question is what standard should be applied in letting him go back out? And are you saying that what he did back in 2006 is the reason he shouldn't be let out now? What I'm saying is that's the reason he's back in prison, and nothing from his point of view, from our point of view, has changed since then. Well, that was five years ago. And he still resists the therapy in which he's rehabilitated. But this court has told you you can't impose that on him, right? No. No. I disagree with that. Let me say, first of all, to get back to the point you raised earlier. Have you read Rickens, too? Have you read Judge Buckwalter's opinion? I would think you would have. And we didn't say that? Let me say that with regard to the issues that are in front of the court today, there have been developments in the law that's constructive, and there have been changes in the factual scenario before the court, which I think required a different disposition. I think it required even Minkins-Thomas, too, to have been decided differently. Okay, and we have to go back to do that. Are you saying we ought to? We have to go back to do that. Right now we are bound by the original decision from Minkins-Thomas 1 and 2. And you can't tell us on our own to do something else because our IAPs say that we can't do that, right? We can certainly apply a change in eligibility. No, we cannot. We are bound. Well, is there a Supreme Court case? There's a Third Circuit case. Well, that doesn't count. It's the earliest Third Circuit case, which governs our appreciation of how we deal with what happens in Minkins-Thomas 1 and 2. So, you know, if that's what you want to argue, at least to me, I think you're not going to get very far. And you might if you had something else to say. Well, let me go back to the point you raised a little bit earlier before we got off on this. And that is, what is the standard that applies? Mr. Hrabowski is here ostensibly on a claim that we have violated the 2004 Abuse Order. And that is not the case. That order said, release Mr. Thomas on parole, and we released him on parole. It does not govern what we do today. We found there, though, that there was an ex post facto violation. Indeed, there were several. There was a continuing course of ex post facto violations, one of which was the sex therapy business. Correct? So, if you're looking at the bottom line, we're looking at what we said was wrong that got us to the bottom line. That hasn't changed. I would like to refocus your attention on the standard that we have to apply. Once we release Mr. Thomas on parole, as this court held the last time around in this litigation, we discharge our obligations under that order. Anything... Let's assume you're right. Let's assume you're right. Does that mean that your failure to release him now is not a denial, and it is not an ex post facto violation? It means that whatever it is is a new claim of a constitutional violation. It's a new claim of the same old violation that we found years ago. Which has to be exhausted in state court, and then necessarily presented in the Amos petition. But what if we say that it's been exhausted? What if we say that his claim has been exhausted? Well, I don't see how you can say that. Well, that's... He has gone to the Pennsylvania Supreme Court. And went to the Pennsylvania Supreme Court. Does he have to go to the Pennsylvania Supreme Court every time for Olson? No. I mean, does the Pennsylvania Supreme Court really want to hear from prisoners every time? Of course. That's exactly my point. There is a procedure, and it's not going to the Pennsylvania Supreme Court, in their original jurisdiction, asking them to do extraordinary... And why did, each time that he did go, why did they grant his application for Lee to file original process? They didn't deny it. They granted it. And then they denied his petition for the abuse relief. All of those issues. Some of them are... They granted it. They granted the petition. They granted the application. The application. They heard his application and denied it. That doesn't change the fact that he has an agreeable remedy by waiving Lee's petition to the Commonwealth Court. And under that... Is that what you are... I mean, is that... Is that what you are hanging your hat on? Is that it? Of course. I'm suggesting that under that, if a state established a procedure for preventing a constitutional claim, you've got to exhaust that procedure. But you have said in Lickens 2 that exhaustion is not jurisdictional. That doesn't make it optional, Your Honor. It's only jurisdictional because the court can deny abuse relief on the merits in the absence of exhaustion, but you cannot grant abuse relief in the absence of exhaustion. Exhaustion can only be placed on the grounds that Congress has prescribed.  You have not exhausted it if you haven't availed yourself of that remedy. That's the plain language of it. So now we have a technical violation here of the law. We have a technical violation of exhaustion. Right. And an 82-year-old man. I mean, what, do you want him to litigate for another five years and see if he's still alive? Well, we could have saved a lot of time if Mr. Thomas had availed himself of the procedure. Okay, I want to ask you. I don't want to hear any more of this. I want to find out. What is this escalating pattern of high-risk behavior that has kept him in all these years? Specifically. And don't give me the kiss on the church lady's lips. What I'm giving you are behaviors that the experts... I want to know the specific behaviors because they're not in this record that I've been able to find. What specific escalating, what comprises this escalating pattern of high-risk behavior? Specifically. Mr. Thomas forcibly kissed a woman, walked up to her, grabbed her by the face, and planted this on her mouth. And when was that? That's the church lady. That is the church lady. And when was that? Where is it forcibly done like that? He walked up to her and grabbed her face. He walked up to her and grabbed her face. And where is that established? Where is that established? That was in the record in the last appeal. It is in the district court transcript from... None of this is properly in front of your office, which is why it's not in the appendix. But when you tell women it's not properly before us, but we're relying on it to keep men. How is it not before us? This, I just asked you, the escalating pattern of behavior, and you mentioned it half a dozen times in your brief. I'm asking you what it is, and then you tell us it's not before you. It's from a previous case. Come on. Okay. The church lady kissed me. I don't see any evidence of grabbing. I don't see any evidence of force. But that's by perception. What is the next incident of escalating behavior? Mr. Thomas made a habit of seeking out women who were in vulnerable situations. And under the scenes monitor, he could fix up umbrellas and give them to them in the rain. He had a pickup truck. That's when he kissed me? Yes, when they were alone. The same thing, he cruise around for women. Wait a minute. Let's go back. He fixed up umbrellas and gave them to women who were in the rain? And this is an escalating pattern of high-risk behavior? He got a pickup truck, in which he would also cruise around in the rain, looking for stranded women to whom he could offer rides. This is... Where's that in the record? This is in the transcript when he, during the last time around before, he kept on walking. Where did he take the women? I don't know if he succeeded in getting them to offer the rides to their homes. Bear in mind, this is red flag behavior. We can't do this to sex offenders. Sex offenders in the Interagent Therapy Program were specifically forbidden from getting jobs such as driving delivery trucks where they might have access to people's homes and get them in situations where they were alone. I notice that they seem very odd to your honors, but that is what the expert said. This was red flag behavior. All right. Where is this? Page 9 of your brief. He presented a significant danger to staff at the treatment center and to the community. What is that? And what significant danger did he present to the staff? He began sexualizing the women's commitments with his individual therapist. He only did one wisecrack, he did? He began projecting on her motivations of manipulation and jealousy and sexual interest. Because of that one quack he made, the sarcastic quack he made? That, again, is red flag behavior. This is the community? Is the community threatened by this wisecrack? And that is the issue that was decided by Commonwealth Courts favorably to us. They heard the experts, they heard the testimony, and they said, yeah, you were justified in reverting this girl's parole. I'm not suggesting you were right in reverting his parole, but you kept him in for five years after that. And that's my point. Nothing has changed about Mr. Thomas. What do you mean? He can't change. He's not outside. He can't change. He's locked up. What do you want from him? We want him to go to a partner of therapy to change the way he thinks. He thinks of women. He must admit that he committed the crime. What does that have to do with the way he thinks about women? He's not going to change unless he accepts responsibility for what he has done. Who says? That's what the experts said. It's not what happened. That's what happened. That's not the line when the sentence was commuted. And that changed what the Supreme Court says. Didn't we do? No. Does that accept it? When his sentence was commuted, he had protested his innocence all the way through. What connection does his belief and profession of innocence, that he was never deviated from, have with the charges of sexualizing in his context of his therapist and thinking about women? Because he's protesting his innocence of a sexual crime, he's refusing to acknowledge what he's done wrong in the past, he refuses to acknowledge the violence that he's committed, and he refuses to back off of what the therapist called his justification and minimization of the violence in his behavior. That's the goal of the therapeutic model, is to change the way people think about their behavior to get them off of the justification of violence. We can't do that unless people first accept responsibility for what they've done in the past. But the therapists also say that after the age of 70, that sexual offenders aren't really much of a threat. Isn't that correct? That's the statistical evidence of a professor at the University of Massachusetts. Our actual experience with Mr. Thomas is to the contrary, and I think we're intelligent. What is your experience with Mr. Thomas since the age of 70 that would cause you to find that Judge Watson is not the case? That when he was out in parole, he kissed the lady in the church. He engaged in a whole series of behaviors that raised red flags to the therapists who concluded that he was not amenable to treatment in an outpatient setting and that he presented a danger to them and to the community. What are these threatening statements he supposedly made to two members of his therapy group? That I can't tell you about. I believe that was a... That is a ground for revocation that was withdrawn under legal autonomy. So it's not... I don't think that those are actually in the record. I got it from somewhere. Mr. Mort, can we take for granted as part of the action in this case that the employee's notation back in March of 07 to Mr. Nickens Thomas that he will be removed from any sex therapy group he's placed in in one to three months if he does not admit his offense and that this will be deemed to be non-defense. Can we assume that that is the situation that he faces now with respect to curing what the grounds for denying parole are, which is a failure to comply with the sex therapy that's being offered? Yes, and if I could expand on that just a little bit, it is outside the record, but I should tell you that it is my understanding that the Department of Corrections no longer offers a looking-like-only-cure-deniers therapy program. See, that was my understanding. Yeah, that all across the board, people who are denying their offenses will be removed into a program, but at some point, if they don't progress to the point of taking responsibility for their actions, they'll be removed from the program. What can this man do to ever get over the kissing and laying in the church and handing out umbrellas to ladies in the rain? What can he do? You keep invoking this stuff, the kiss is possible, but you're still going to tell us that the high-risk behavior is keeping him in and the high-risk behavior, he kissed a lady in the church and he handed out umbrellas and he drove around in a pickup truck. If Mr. Thomas enrolls in the sex offender therapy course and successfully completes it, I don't think that would be a problem. I can't predict what the parole board is going to do. I think I can. I think that's unjustified. I'm not sure it is. I am not sure it is. I'm wondering what he can do to get out. May I remind the court that Mr. Thomas has been singing his tune of retaliation for 10 years now and the last two times that he has litigated it, in Mickin Thomas 3 and Mickin Thomas 4, the courts have found that there was no evidence at all of any convictedness or retaliation on the part of the parole board. If Mr. Thomas enrolls... Mr. Merrill, would you agree that we are in a time now where the eye has been peeled and the nub is the refusal to admit to the offense as part of a therapy program that requires it? Can we just... I keep coming back to that because it seems to me that this is what it represents. He's been out in the street. You can't point to anything that he's been doing since he was enlisted in February of 2006, correct? That's right. Okay, so the thing he's not doing is making reparation for it by going into a sex therapy group whereby he admits to the crime for which he was convicted, correct? Correct, and successfully completing that course so that we have a sense that this is not at this point about punishment. This is about prediction. We're trying to figure out what's going to happen if we let this guy out. Mr. Merrill, what are you predicting he's going to do? He's 82. What is he going to do? We can only judge based upon what he has done in the past. No, no, no. He's aging. He's aging. That's what I'm saying. When a three-month-old spits up all the time, he's going to spit up when he's 21 because he did it when he was little. We're talking about aging. We're talking about developing, looking at humanity, life. And we're talking about rehabilitation. What's the evidence that this man has rehabilitated himself? What's the evidence that he has in any way changed the state of mind that led him to commit this horrible crime? Do you care about his state of mind if he's incapable of doing anything about his state of mind? Are we really into now mind control of an 82-year-old man? We're talking about protecting society from felony. But if he's 82 years old, exactly what do we need to protect ourselves? I have met a lady who will watch a drop that says it wants you to a certain age. I say, well, you can't commit any more crimes. No, but you aren't, I mean, if an 82-year-old man annoyed me, I'd push him down on the ground. And I'm not that far from 82 myself, but, you know, you've got to be realistic about at 82 years old, maybe someone has some really bad thoughts in his head but he doesn't necessarily have the physical being, well-being, to implement anything. Well, that's a judgment that is entrusted to the parole board and the people who work with the parole board and get it to the catalyst. And the people in the prison also, you ought to get paroled. He has passed all... Are you going to bring him back to Bay Area? No, because they're not the final decision-makers. But they're the ones in contact with him. They're the ones who present the programs to him and they all say we recommend him for parole. And it is not unusual, as I'm sure you know, for people to have been able to function quite well on the inside and yet not to be able to adapt to life on the outside. But I've gone on and on to ask more questions. I'll be happy to try and answer them. No? No. Judge Gilbert? Thank you. Mr. Lewowski. Thank you, Judge Berry. Let me just make three quick points in a row. By exhaustion, there is nothing in Ed's book that says when you go to the highest court of the state and you deny them the merits, the fact that there may be a remedy in the lower court requires you to go back to that lower court. There's no authority to that proposition. He exhausted it defensively in the Supreme Court. This court has continued jurisdiction regardless. With respect to the high-risk behavior, you've again heard an exaggeration. He grabbed a woman in the church. He forced herself on her. The only evidence in the record is Mr. Thomas' description of what happened. I gently lifted her lips and gave her a kiss. I'm sorry, as I did it, and self-reported that. The parole board wouldn't have even known about it. He self-reported it to the parole board. The women he picked up, there's not a single complaint. In the 18 months Mr. Thomas was on parole, not a single complaint from any citizen, woman, man, child, or anybody, that he did anything offensive. He was not arrested. There was no allegation of any kind of criminal conduct. And with respect to his interaction with his therapist, which is raised again, the inappropriate remarks we made, he did not intimidate her. And indeed, he was required, under the parole rules, to report any deviant thoughts. This is a question about thoughts. He was required. He said, this is what I'm thinking. I'm thinking you're really not helping me very much. It may be deviant, maybe not. It's not sexual on my part. So he did exactly what the parole board required him to do. They didn't tell him to stay away from women. They didn't tell him to not fix umbrellas. They never charged him with that. He's not charged. And there's nothing in the parole denials of the past five years that talks about iris behavior. They didn't cite to that. I mean, this is another post hoc rationalization. Well, they did in the May 2009 denial have the protection of the safety of the public. But they had to delete that as a quote-unquote technician's error the following month. And they could delete it because they didn't use it. That's right. That's right. That's right. That's right. And finally, Judge Roth, you're right. There was a meta-study done by the best expert in the country on recidivism in this kind of situation, which said after 70, the risk is near zero. Mr. Thomas is 82. And their expert who testified as a proceedings recognized him as a leading expert on that. Now, we're not saying, is it 100% possible that they could do something that's offensive against that? There's almost a risk of your 100, I suppose, something could happen. But when you look at this record, he's done everything he can. He's insisted on his innocence from 1964. This is not something new. He's not going to say, I did it. He says he didn't do it. And that's this case was, as you know, problematic from the beginning in terms of guilt or innocence. I'm not arguing innocence here in this court at this time. That's been his position. He's done everything the institution requires. This board will never let him out, therapy program or not therapy program. And the point for this court is under ex post facto law, he cannot be required to be in the admittance program. That's why he's not out on the streets today. Thank you very much. Thank you very much. Counsel, we'll take the case under advisement. We will clear the court room and lock it so that we can conference with the video with Judge Hayden. Thank you very much.